UNITED STATES ex rel. NITKEY v.
DAWES et al.

No. 8757.

Circuit Court of Appeals, Seventh Circuit.

Nov. 7, 1945.

Walter F. Dodd and Harry G. Fins, both of Chicago, Ill., for appellant.

J. Albert Woll, U. S. Atty., Andrew J. Dallstream, Arthur M. Cox, and John F. Cashen, Jr., all of Chicago, Ill., J. Gregory Bruce, Department of Justice, of Washington, D. C., and Fredric H. Stafford and John B. Robinson, Jr., both of Chicago, Ill., (Pam, Hurd & Reichmann, of Chicago, Ill., of counsel), for appellees.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

SPARKS, Circuit Judge.

This appeal is prosecuted only by the plaintiff, Raymond J. Nitkey, hereafter referred to as the "relator." The case is a qui tam civil action. The complaint was filed June 22, 1943, under the "Informer's Act," as it then existed. 31 U.S.C.A. §§ 231 to 235 inclusive.* The amended complaint was filed August 19, 1943. This Act was amended December 23, 1943, and on January 20, 1944, the District Court, under § 232(D) as thus amended, stayed these proceedings, and ordered notice to be given to the Attorney General of the United States, as therein prescribed. This was done and on March 18, 1944, the United States entered its appearance. The rulings complained of are the court's orders of December 28, 1944, dismissing the relator's suit for want of jurisdiction, on

---

* § 231. "Any person not in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States, who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, or who, having charge, possession, custody, or control of any money or other public property used or to be used in the military or naval service, who, with intent to defraud the United States or willfully to conceal such money or other property, delivers or causes to be delivered, to any other person having authority to receive the same, any amount of such money or other property less than that for which he received a certificate or took a receipt, and every person authorized to make or deliver any certificate, voucher, receipt, or other paper certifying the receipt of arms, ammunition, provisions, clothing, or other property so used or to be used, who makes or delivers the same to any other person without a full knowledge of the truth of the facts stated therein, and with intent to defraud the United States, * * * shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit. (R.S. §§ 3490, 5438.)"

§ 232. "The several district courts of the United States, * * * within whose jurisdictional limits the person doing or committing such act shall be found, shall, wheresoever such act may have been done or committed, have full power and jurisdiction to hear, try, and determine such suit. Such suit may be brought and carried on by any person, as well for himself as for the United States; the same shall be at the sole cost and charge of such person, and shall be in the name of the United States, but shall not be withdrawn or discontinued without the consent, in writing, of the judge of the court and the district attorney, first filed in the case, setting forth their reasons for such consent. (R. S. § 3491.)"

§ 234. "The person bringing said suit and prosecuting it to final judgment shall be entitled to receive one-half the amount of such forfeiture, as well as one-half the amount of the damages he shall recover and collect; and the other half thereof shall belong to and be paid over to the United States; and such person shall be entitled to receive to his own use all costs the court may award against the defendant, to be allowed and taxed according to any provision of law or rule of court in force, or that shall be in force in suits between private parties in said court: Provided, That such person shall be liable for all costs incurred by himself in the case, and shall have no claim therefor on the United States. (R.S. § 3493.)"

§ 235. "Every such suit shall be commenced within six years from the commission of the act, and not afterward. (R.S. § 3494.)"

motion of all defendants, and denying his motion to strike the appearance of the United States of America.

The facts upon which this controversy arises are as follows: On June 27, 1932, the Central Republic Bank and Trust Company of Chicago, an Illinois banking corporation (hereafter referred to as the State Bank), obtained a loan of $90,000,000 from the Reconstruction Finance Corporation (referred to hereafter as R. F. C.). That bank received the money represented by such loan from R. F. C. on the following dates and in the following amounts,— June 27, 1932, $10,000,000; June 29, 1932, $30,000,000; October 6, 1932, $50,000,000. It is alleged in the amended complaint that the individual defendants were directors or officers of this state bank at the time of the loan, and became members of the board of directors of the defendant, the City National Bank and Trust Company (hereafter referred to as the City National Bank), upon its organization on or about October 6, 1932, and still are.

On or about October 5, 1932, there was $50,000,000 of the loan undelivered to the State Bank, and all of the latter's assets except cash had been pledged and delivered to R. F. C. as security for the loan. As a condition precedent to the payment to Central Republic by R. F. C. of the balance of the loan, it was then proposed by the individual defendants to organize the City National, and by appropriate contract between City National and R. F. C. that City National would take up and purchase from R. F. C. approximately $15,000,000 of the assets pledged to and held by R. F. C., $10,000,000 of which would be acquired absolutely by City National, and the other $5,000,000 would be acquired, subject to the right of City National during an agreed period, to substitute the $5,000,000 of assets, or any part thereof, for an equivalent amount of the collateral assets retained by R. F. C. At that time it was mutually understood by the Comptroller of the Currency, and its General Counsel, and by the individual defendants that the Illinois Statute provides in substance that an Illinois State bank may *sell* all of its assets to another bank without first obtaining the consent of its shareholders, provided the purchasing bank assumes *all* of the liabilities of the selling bank and the transaction is approved by the State banking authorities of Illinois.

Prior to October 5, 1932, the Comptroller of the Currency presented to the General Counsel of the Division of Insolvent National Banks, a written memorandum upon which he sought an opinion concerning the liability of the proposed City National Bank and Trust Company, under its contemplated contract, for the reconstruction loan made to the State Bank. This memorandum stated the assumed facts relating to the proposed transaction as a basis for the requested opinion. Among other facts, not here material, it stated that the National Bank assumed and agreed to pay the "existing unsecured deposit liabilities" of the State Bank, as shown by books at the close of business on the date of the consummation of the transaction; that the term "unsecured deposit liabilities" as used in the contract was specified not to include "deposit liabilities payment whereof may be secured by pledged collateral but shall include deposit liabilities payment whereof may be secured by a surety or other similar bond." It further stated that the State Bank acknowledged itself indebted to the National Bank for the amount of liabilities so assumed, and, in order to enable the National Bank to pay said deposit liabilities on demand, the State Bank agreed that it would pay and deliver to the National Bank cash aggregating the full amount of the deposit liabilities so assumed, said cash funds to be credited by the National Bank upon the aforesaid indebtedness of the State Bank to the National Bank resulting from assumption of said liabilities. It further stated: "Nothing herein contained or otherwise shall constitute an assumption by the National Bank of, or in any way render the National Bank liable for, directly or indirectly, any obligations of the State Bank of any kind or character whatsoever other than the said deposit liabilities herein specifically assumed."

It further stated as assumed facts that, "It is understood that several months ago a commitment was made by the R. F. C. to the State Bank to loan it approximately .......... Millions of dollars, and that a portion of said loan has heretofore been paid over to the State Bank in accordance with the commitment and that it is now contemplated that the R. F. C. will pay over to the State Bank the balance of the commitment ($50,000,000), or so much as may be found to be necessary to enable the

State Bank to acquire the cash for delivery to the new National Bank in accordance with the foregoing contract between the two banks. It is further understood that as security for the R. F. C. loan, the State Bank pledged all of its assets (other, of course, than its cash) to the Finance Corporation and that R. F. C. now holds said assets, and that as a condition precedent to the payment by R. F. C. to the State Bank of the balance of said commitment, an appropriate contract is to be drawn, apparently between the new Bank and R. F. C., whereby the National Bank will agree to take up or purchase from the Finance Corporation approximately $15,000,000 of the assets held in pledge by the Finance Corporation from the State Bank, $10,000,000 * * * to be acquired absolutely by the National Bank, and the other $5,000,000 to be acquired subject to the right of the National Bank during an agreed period, to substitute said $5,000,000 of assets or any part thereof for an equivalent amount of the collateraled assets retained by the Finance Corporation."

The assumed facts then set forth the substance of the Illinois Statute which we have quoted.

The query submitted was: "Does the City National Bank, as a result of its contract above outlined whereby it assumes the unsecured deposit liabilities of the State Bank, also assume or become liable for the loan made by R. F. C. to the State Bank?"

The General Counsel gave his written opinion, on October 5, 1932, that the new National Bank would not, by entering into the above transaction, become liable for the repayment of any part of the aforesaid loan to R. F. C. He further stated that the transaction as submitted could not be considered, in substance, a sale, for the reason that there were no assets, other than the money passing from the State Bank to the National Bank, and according to the contract the money which was to be paid by the State Bank to the National Bank was expressly provided to be in payment of the debt of the State Bank to the National Bank arising from the agreement of the National Bank to assume specified deposit liabilities of the State Bank. He further stated: "The transaction is, in final analysis, an arrangement between the two banks whereby the National Bank pays the deposit liabilities of the State Bank, with a provision for reimbursement to the National Bank by the State Bank. Conse-

quently, if this construction of the contract is correct, the Illinois Statute does not apply and no liability to the National Bank exists for repayment of the Reconstruction loan."

On the question of estoppel he further stated as follows: "I am most emphatically of the opinion that no court would hold that R. F. C. could actively participate in this transaction, and furnish the money for its consummation, with a knowledge of the entire situation, and at the same time preserve the status of an unknown or unlisted creditor vested with power of attack upon the very transaction it helps to culminate. I feel sure that the courts would hold that the R. F. C. would be estopped from raising the point that it, as a creditor, was not included among the creditors whose debts were assumed under the contract. This view is supported by the additional element of estoppel that it is understood that it will be one of the conditions imposed by the R. F. C., before it will release the balance of the loan commitment, that the new bank must agree to take from the R. F. C. $15,000,000 of the assets of the old bank already pledged with it so as to reduce, to that extent, the business risk assumed by the R. F. C. in disbursing the balance of the commitment to the old bank. * * *"

The facts with respect to the memorandum of the Comptroller of the Currency and the opinion of his General Counsel, as above referred to, and as verified by the oath of the former, are before us as an exhibit to defendant's motion to dismiss plaintiff's action because of lack of jurisdiction.

As we understand plaintiff's theory it is that City National's contract to assume and pay the State Bank's deposit liabilities is invalid under the Illinois statute, Smith-Hurd Stats. c. 16½, § 12, because City National did not assume *all* liabilities of the State Bank including its loan from R. F. C. If this were true, then a cause of action such as plaintiff has alleged arose in 1932, when the contract was entered into and performed, and could be sued upon at any time within six years from the time the cause of action arose, at the expiration of which time the court lost jurisdiction of the subject matter. This plaintiff waited eleven years before filing his complaint.

However, plaintiff contends that in violation of the statute the defendants concealed their alleged misconduct in fail-

ing to report the liability of City National for the debt of the State Bank to the R. F. C. in its subsequent reports which were required by statute to be made to the Comptroller of the Currency three times each year. Hence he argues that each of such concealments tolled the statute, 31 U.S.C.A. § 235, with respect to the original alleged debt plus the accumulated interest thereon, and the penalties. That section is more than a mere statute of limitations. It is jurisdictional and strictly limits the power of the court to assume jurisdiction. United States ex rel. Louisville Cement Co. v. Interstate Commerce Commission, 246 U.S. 638, 38 S.Ct. 408, 62 L.Ed. 914, and cases therein cited. So far as this jurisdictional requirement is concerned there is no distinction between an administrative body and a district court. A. J. Phillips Company v. Grand Trunk Western Railway Co., 236 U.S. 662, 35 S.Ct. 444, 59 L. Ed. 774. These decisions have been followed by this circuit. Wisconsin Bridge & Iron Co. v. Illinois Terminal Co., 7 Cir., 88 F.2d 459.

Moreover, as early as 1932, before City National's contract was entered into, the Comptroller of the Currency and his General Counsel, and R. F. C. had full knowledge of all the facts relating to the contract, which plaintiff now contends were subsequently concealed from them. This would seem to be a contradiction in terms. There was no concealment either of fact, or of the existence of the Illinois statute. The theory upon which plaintiff contends that the statute was tolled is that City National, in its subsequent reports to the Comptroller of the Currency, did not list as one of its liabilities the loan by R. F. C. to the State Bank, notwithstanding the fact that the Comptroller had acquiesced in its General Counsel's opinion that the proposed contract would be valid and not violative of the Illinois statute, because it did not involve a sale of assets of the State Bank, and that under such contract the defendants would not be liable for the debt to R. F. C. The latter also acquiesced in and relied upon that opinion as an inducement to defendants to execute and perform it. All parties to the contract and the Government had full knowledge of the facts at that time, and this is admitted by plaintiff's brief, where in discussing that part of the General Counsel's opinion relative to the estoppel of the Government to attack the transaction, he uses the following language:

"This statement clearly indicates the knowledge of fraudulent conduct and a desire to avoid the results of such conduct. It is clear—perhaps too clear—that an agency of the United States was acquainted with the facts; and this makes it more important that someone be permitted to protect the government, if the Attorney General lacked acquaintance with the facts."

We think this statement is unwarranted from the facts disclosed, and for that reason we are not content to rest our decision upon the mere statement that the district court was without jurisdiction, lest uninformed creditors might inferentially conclude that plaintiff's action had been disposed of as the result of a mere technicality, and that thus a grievous crime was being shielded by the aid of Government agencies,—the R. F. C., the Comptroller of the Currency, and his General Counsel, whose names we mention because they had full knowledge of all the facts. This inference of guilt would necessarily include the Attorney General, who, after becoming acquainted with all the facts, chose not to prosecute an appeal on behalf of the Government.

Aside from the Illinois statute no contention is made here that the contract of City National Bank was in any manner illegal or invalid. The assets of the State Bank at the time of this transaction have been accounted for, and this court has adjudicated the liability of the stockholders of that bank. Reconstruction Finance Corporation v. McCormick, 7 Cir., 102 F.2d 305. As to the Illinois statute, we agree with the opinion of the General Counsel, Division of Insolvent Banks, that no sale of the assets of the State Bank was involved in City National's contract.

It is quite true that the amended complaint also alleges that the individual defendants obtained this loan for the State Bank, when they were its officers, by knowingly misrepresenting to R. F. C. the value of the assets pledged to secure it. We are not informed as to what those misrepresentations were, either by record, brief or argument, nor are we informed by allegation or proof that R. F. C. relied upon them in making the loan. As bearing on the question of misrepresentation of the value of the assets pledged by the State Bank and held by R. F. C. since the loan was made, the receiver of the State Bank

confirmed the following report of this account as of August 31, 1944, as follows:

Total receipts by R. F. C... $100,653,669.68
Less reimbursement to R. F. C. for care and preservation of collateral, and expenses of liquidation of same ................. 3,497,116.04

$ 97,156,553.64

Estimated value of unliquidated collateral, which in Receiver's judgment will result in this amount of further realization within a short time ........ 2,350,000.00

Total realization ..... $ 99,506,553.64
Amount loaned ......... 90,000,000.00

Excess over amount loaned ........... $ 9,506,553.64

In any event, almost eleven years elapsed before this suit was brought, and we think it is clear that it was barred by § 235 of this Act. However, plaintiff postulates that each statute of limitations begins to run only when a complete and present cause of action has accrued and the extent of damage can be measured. Hence, he urges that since the individual defendants concealed the falsity of their representations, and since the State Bank was, and still is in process of liquidation by a receiver, it was impossible to determine the extent of damage earlier than the filing of his complaint, on June 22, 1943, and that therefore his alleged cause of action did not accrue before that time, and that the limitation provided by § 235 of this Act will be tolled until that time in aid of the court's jurisdiction.

We are unable to concede the correctness of the broad rule urged by plaintiff with respect to the accrual of actions and the tolling of the ordinary statutes of limitations, nor is it necessary to discuss it. We are not confronted with such a statute. We are dealing with a special statute relative only to qui tam actions, and it carries its own jurisdictional requirement that action be brought within six years. The language is plain and unambiguous and we think it should be strictly construed. It is not to be tolled or extended on account of fraud (see Pollen v. Ford Instrument Co., 2 Cir., 108 F.2d 762; Bell v. Wabash R. Co., 8 Cir., 58 F.2d 569),

for it involves jurisdiction of the subject matter, and that cannot be acquired even by consent, in opposition to the statute.

Section 232 of the Act was amended December 23, 1943, drastically limiting the conditions under which qui tam suits can be instituted and carried on. The plaintiff has challenged the constitutionality of this amendment. It is unnecessary to pass upon the questions raised by this contention, in view of the fact that we have sustained the ruling of the District Court in dismissing the action for lack of jurisdiction.

Order affirmed.