Jeryl **MOLL**, on behalf of herself and all others similarly situated, Plaintiff,

v.

**US LIFE TITLE INSURANCE COMPANY OF NEW YORK,** Defendant.

Albert **ELSER**, Robin Harlow, Jolene Harlow and Brian McGuire, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**TITLE USA, INC.** f/k/a US Life Title Insurance Company of New York, Defendant.

**Nos. 85 CIV. 6866 (PKL), 86 CIV. 4271 (PKL).**

United States District Court, S.D. New York.

Feb. 17, 1987.

Paul K. Rooney, P.C., New York City, for plaintiffs.

Rogers & Wells, New York City, for defendant; James N. Benedict, Bruce Braverman, Joshua A. Leuchtenburg, Margaret M. Vande Wiele, of counsel.

LEISURE, District Judge:

The above-captioned matter is a consolidation of two separately filed actions: *Moll v. US Life Title Insurance Company of New York* (hereinafter referred to as the "*Moll* action"), 85 Civ. 6866 (PKL) and *Albert Elser et al. v. Title USA, Inc., f/k/a US Life Title Insurance Company of New York* (hereinafter referred to as the "*Elser* action"), 86 Civ. 4271 (PKL). In these suits, plaintiffs on behalf of themselves and a proposed class to be over several thousand persons, allege violations committed by defendant of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, the New York Insurance Law § 6409, and the common law. Jurisdiction over this action is allegedly conferred upon the Court by 12 U.S.C. § 2614, 18 U.S.C. § 1964, 28 U.S.C. § 1331, and the principles of pendent jurisdiction.

The consolidated matter is now before the Court upon defendant's motion seeking dismissal of the actions pursuant to Fed.R.Civ.P. 12(b) and 9(b). The Court, in considering defendant's motion to dismiss, is bound by the general rule that for defendant to succeed it must demonstrate " 'beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief.' " *Gold-*

*man v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) ). The factual allegations contained in the complaints are accepted as true for the purposes of deciding the instant motion. *Dwyer v. Regan,* 777 F.2d 825, 828–29 (2d Cir.1985). For the reasons set forth below defendant's motion is granted. However, plaintiffs are granted leave to replead their complaint to the extent consistent with this opinion *infra.*[1]

## FACTUAL BACKGROUND

### The Moll Action

### The Parties

Plaintiff Jeryl Y. Moll is a resident of West Haverstraw, Rockland County, New York. Defendant US Life Title Insurance Company of New York ("US Life") is an institution, as defined in 12 U.S.C. § 2602(4), which issues title insurance policies on residential and commercial real estate in Rockland County in New York State, having its principal office and place of business at 120 Broadway in the City of New York.

### The Moll Transaction

In June 1982, plaintiff and her husband ("the Molls"), then residing in Palisades Park, New Jersey, retained James M. Feeney, Esq. ("Feeney"), an attorney in New City, New York, to represent them in the purchase of a home, located at 36 Kennedy Drive, West Haverstraw, Rockland County, New York. The Molls obtained a federally-insured mortgage loan from Midlantic Home Mortgage Corporation ("Midlantic") to finance this purchase. In order to secure this financing, the Molls needed title insurance. Feeney stated that he would acquire the insurance for the Molls. Feeney ordered this title insurance from US Life. Moll Second Amended Complaint ("Moll Complaint"), ¶¶ 35–36.

On August 30, 1982, at the real estate closing on their new home, the Molls paid $578.00 for title insurance to US Life. This was the amount of the premium charged by US Life. At the closing, Feeney provided the Molls with a copy of HUD–1 Uniform Settlement Statement. *See* Moll Complaint, Exhibit A. On line 1108 of this form, under the words "Title Charges", there appears the words: "Title insurance to". Feeney inserted there, or caused to be inserted, "US Life Title Insurance Company $578.00". Moll Complaint, ¶ 39.

US Life was represented at the closing by Mr. Timothy Miller ("Miller") of the Heritage Abstract Corporation ("Heritage"). *See* Moll Complaint, Exhibit B. At the closing, the Molls were not given a bill for $578.00 by US Life. Instead, Miller presented them with a bill for $950.50 on Heritage stationery. This bill was for various expenses, including the $578.00 premium for title insurance. *See* Moll Complaint, Exhibit C. Feeney paid this bill to Heritage out of monies deposited with him by the Molls. *See* Moll Complaint, Exhibit D.

Moll claims that at a time unknown to her, US Life, through Miller or Heritage, rebated[2] a portion of the $578.00 to Feeney or another person. This rebate was paid without the knowledge or consent of the Molls. Furthermore, Moll claims that this rebate was paid pursuant to an agreement among Feeney, Miller and US Life to the effect that title insurance business would be referred to US Life by Feeney; and that they allegedly agreed that this payment was not for services actually rendered or performed by Feeney in the issuance of the title insurance policy. Furthermore, Moll conclusorily alleges that:

> [S]he never had any opportunity to discover the fraud practiced upon her and her husband until after September 1984. It was then that a foreclosure action was instituted by Midlantic and she obtained independent counsel. That counsel later

---

**1.** The Court hereby orders plaintiffs to merge their amended complaints in the interest of clarity.

**2.** Plaintiff characterizes this rebate as a "kickback" throughout her papers.

discovered the fraud which had been practiced upon plaintiff by defendant US Life.

Moll Complaint, ¶ 47.

### The Elser Action

Plaintiffs Albert Elser, Robin Harlow and Jolene Harlow (the "Harlows"), and Brian McGuire are all residents of Orange County New York. Defendant is US Life. The transactions which form the basis of the complaint in the *Elser* action are almost identical to those described in the *Moll* action. The only differences material to the resolution of the instant motions is that Elser's real estate closing occurred on February 10, 1983, the Harlow's real estate closing occured on December 1, 1983, and McGuire's real estate closing occurred on October 12, 1982. The *Elser* action was filed in 1986.

### The Fraudulent Scheme

Plaintiffs—in both the *Moll* and *Elser* actions—further claim that numerous home purchasers retained attorneys admitted to practice in New York to assist them in buying their homes and in obtaining federally related mortgage loans. These attorneys informed the purchasers that in order to obtain federally related mortgage loans, the buyers needed to secure title insurance. These attorneys allegedly then ordered their title insurance from US Life. US Life purportedly agreed with these attorneys to rebate a portion of the premiums for title insurance paid by the purchasers in return for the referral of title insurance business. US Life allegedly failed to disclose to the purchasers that this rebate was built into the premium rate for title insurance.

At these real estate closings, various persons, including Miller of Heritage, represented US Life. Similarly, at the closings, the purchasers were furnished with copies of HUD–1 Uniform Settlement Statements showing the amounts of the premiums which they paid to US Life. The purchasers were not informed of the alleged rebates. Representatives of US Life, for example, Miller of Heritage, collected the payments of premiums from the purchas-ers at the closings. Then these representa-tives allegedly paid rebates to the attorneys. Allegedly in an attempt to conceal the payment of the rebate to the attorneys, these representatives remitted a "net" check to US Life in an amount excluding the alleged rebate. The rebates were allegedly not paid for services actually rendered or performed by the attorneys in the issuance of the title insurance policies.

The purchasers were not informed that part of the premiums which they paid for title insurance were allegedly rebated to their attorneys. The purchasers did not consent to the payment of these rebates. The attorneys did not credit the rebate to the accounts of their clients-purchasers. Again plaintiffs summarily charge that:

[Plaintiffs] and the members of the [putative] class, could not, in the exercise of reasonable diligence, have discovered the [alleged] fraud practiced and the [rebate] scheme heretofore [described], ... because of the acts of defendant US Life in concealing the payment of the kickbacks.

Moll Complaint, ¶ 67.

US Life charged and received title insurance premiums based on a rate approved by the New York State Superintendent of Insurance. Plaintiffs charge that included in that rate was the cost of the rebates allegedly paid by US Life.

### The RICO Claims

Plaintiffs also claim that between on or about August 30, 1979, and on or about August 28, 1986, US Life, for the purposes of executing the aforesaid allegedly fraudulent scheme, did place and cause to be placed, in a post office and other authorized depositories for mail matter, letters, United States Department of Housing and Urban Development Forms # 1, transmittal letters to lenders approved by the United States Federal Housing Administration, title insurance forms, title insurance policies, and checks addressed to members of the alleged RICO enterprise or to plaintiff or to members of the putative plaintiff class. *See, e.g.,* Moll Complaint at ¶ 80(a). Furthermore, plaintiffs allege that US Life

also used interstate telephone facilities, writings, signs, sounds, messages and signals to members of the alleged RICO enterprise or to plaintiffs or to the putative plaintiff class in furtherance of its allegedly fraudulent scheme.

Plaintiffs claim that a group of attorneys, who represented purchasers of residential real estate, and other individuals and corporate entities, all "associated in fact and engaged in the real estate settlement industry in Rockland County, New York" constitute the RICO enterprise. Also plaintiffs allege that US Life invested the income it earned from the purportedly fraudulent activity to further its RICO enterprise.

Plaintiffs' final claim is that pursuant to the fraudulent scheme engineered by US Life, defendant acted to deprive plaintiffs and members of the putative class of their right to undivided loyalty of the attorneys representing them in their purchases of residential real estate. Plaintiffs allege that US Life willfully, knowingly and intentionally interfered with these attorney client relationships. Specifically, US Life committed these violations by allegedly paying rebates to the attorneys and failing to disclose these payments to plaintiffs.

## LEGAL DISCUSSION

### Joinder of Moll's Husband

As a threshold matter, defendant seeks the joinder of Moll's husband as a necessary party. Rule 19(a) provides, *inter alia,* that a person:

shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

Fed.R.Civ.P. 19(a).

In the instant action, Mr. Moll was the joint applicant for the title insurance at issue and the co-owner of the house covered by the insurance. Moll Complaint, ¶¶ 35–37 and Ex. A and B annexed thereto. Defendant notes that Mr. Moll's interest in this litigation is identical to that of his wife. Thus, it appears that he should be joined to avoid the possibility of double or inconsistent judgments and to provide complete relief among all parties to the contract. *Kamhi v. Cohen,* 512 F.2d 1051 (2d Cir.1975); *Lawrence v. Sun Oil Co.,* 166 F.2d 466 (5th Cir.1948). *See also Rainbow Trucking, Inc. v. Ennia Insurance Co.,* 500 F.Supp. 96 (E.D.Pa.1980).

Mrs. Moll objects to the joinder of her husband. She notes that Mr. Moll is himself a member of the proposed class. Mrs. Moll also points out that because her husband's claim is directly attributable to that asserted by her, there is no practical reason to require his joinder as a party. She also argues that in light of the relatively small amount of money involved in her claim—the $578.00 premium—it is inconceivable that Mr. Moll would commence another suit. Moreover, she asserts that the resolution of the issues in this case would effectively bar such a separate action by Mr. Moll.

The Court must reject Mrs. Moll's first argument against joinder—namely, that Mr. Moll is a member of the proposed class—because no class has yet been certified. Second, contrary to Mrs. Moll's assertion, it is conceivable that her husband would commence a new lawsuit, if her suit fails or is discontinued at any time prior to a full trial. As defendant correctly notes, Rule 19 "requires joinder to preclude parties from, among other things, having to face the 'risk' of being sued by the nonjoined party; it does not require proof that the party indeed will file suit." D. Moll Memo. at 2. *See Rainbow Trucking, supra,* 500 F.Supp. at 98–99. Mr. Moll undeniably has an interest in this action and his wife offers no reason why he cannot be

joined as a party.[3] Therefore, to ensure that all "interested" parties "will have the benefit of finality as to the judgment rendered," *id.* at 98, the Court hereby orders that Mr. Moll be joined.

### The Statute of Limitations for RESPA Claims

RESPA was enacted by Congress in 1974 "to ensure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the [real estate] settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a). Section 2607 states, in pertinent part, as follows:

(a) **Business referrals.** No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

(b) **Splitting charges.** No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

12 U.S.C. § 2607(a)(b).

Section 16 of RESPA, which, as enacted in the Statutes at Large, provides:

### JURISDICTION OF COURTS

Sec. 16 Any actions pursuant to the provisions of section 2607 or 2608 of this title may be brought in the United States district court or in any other court of competent jurisdiction, for the district in which the property involved is located, or where the violation is alleged to have occurred, *within one year from the date of the occurrence of the violation....*

88 Stat. 1731 (codified at 12 U.S.C. § 2614 (Supp. I 1983). U.S.C. § 2614 (1985) (emphasis supplied).

It is undisputed that none of the plaintiffs, in either the *Moll* action or the *Elser* action, brought his/her claim within the one-year period. Therefore, it appears that plaintiffs' complaints are barred by the statute of limitations. Plaintiffs, however, argue that their claims are not time barred pursuant to one or more of three possible doctrines: equitable tolling, equitable estoppel or continuing course of tortious conduct.

### Equitable Tolling and Equitable Estoppel

On facts quite similar to those at bar, the District Court of the District of Columbia held that under § 2614 of RESPA the Court lacked jurisdiction to consider plaintiff's claim, and therefore did not reach the merits of the case. *See Passo v. City Title & Escrow Co.*, No. 85–1125 (D.D.C. May 28, 1985) [Available on WESTLAW, DCTU database] (RE 44–47). In that action, plaintiff had not filed his suit until nearly three years and two months after the settlement, and the Court found that he had not stated adequate grounds for tolling the filing requirement. *Id.* at 3 (RE 46). Holding that the time limitation of § 2614 was jurisdictional, the court dismissed Hardin's claim for want of subject matter jurisdiction. *Id* at 4 (RE 47).

The plaintiff appealed the decision asserting that the time limitation of § 2614 is *not* jurisdictional, and instead is merely a statute of limitations, an affirmative defense. Thus, plaintiff claimed that the one-year limitation is capable of being waived and subject to equitable tolling, and that the District Court erred in dismissing his claim because he properly alleged fraudulent concealment which operated to toll the statute of limitation.

---

**3.** In this case there is no feasible reason why Mr. Moll cannot be joined. This action is not like *Hamond v. Clapp*, 452 F.Supp. 885, 886 (S.D.N.Y.1978)—the only case cited by plaintiff in its opposition to joinder—where joinder would have destroyed the Court's diversity jurisdiction.

In *Hardin v. City Title & Escrow Co.*, 797 F.2d 1037 (D.C.Cir.1986) the District of Columbia Circuit Court affirmed the district court on this precise question. The Circuit Court "interpret[ed] the language of the statute to indicate an intent by Congress to make the time limitation contained in § 2614 a jurisdictional requirement." *Id.* at 1039. Moreover, because the Court held that "this time limitation is jurisdictional, it is not subject to equitable tolling under the doctrine of fraudulent concealment." *Id.*

■ The Circuit Court bases its decision on a variety of persuasive grounds. First, it points out that Congress in enacting § 2614 "indicates an intent to place a jurisdictional time limitation upon the commencement of actions to recover damages under the Act." *Id.* "Section 2614 establishes identical jurisdictional grounds for both federal and state courts. Because the time limitation contained in § 2614 is an integral part of the same sentence that creates federal and state court jurisdiction, it is reasonable to conclude that Congress intended thereby to create a *jurisdictional* time limitation." *Id.* (emphasis in original.) Moreover, the Circuit Court explains that:

The subtitle of the section also indicates Congress's intention that the time limitation be jurisdictional. In enacting § 2614, Congress entitled the section "JURISDICTION OF COURTS." Pub.L. No. 93–534, § 16, 88 Stat. 1725, 1731 (1974). This description of the legislation was not added by the publisher or codifier, but was part of the Act as written and passed by Congress. As such, it constitutes an indication of congressional intent, *see Utah Power & Light Co. v. ICC*, 747 F.2d 721, 727 (D.C.Cir.1984), the most reasonable interpretation of which is that Congress intended the statute to create the courts' "jurisdiction," *i.e.*, a jurisdictional time limitation.

*Id.* After carefully considering the relevant records, this Court is persuaded by the *Hardin* Court's conclusion that "nothing in the congressional committee reports or floor debates on the legislation contradicts this interpretation of congressional intent." *Id.* (citing H.R.Rep. No. 1526, 93 Cong., 2d Sess. 14 (1974), U.S.Code Cong. & Admin.News 1974, p. 6546 (Conference Report); H.R.Rep. 1177, 93rd Cong., 2d Sess. 15 (1974) (where the "JURISDICTION OF COURTS" subtitle is repeated); U.S.Code Cong. & Admin.News 1974, p. 6546; 120 Cong.Rec. 23,549–23,561, 24,926–24,930, 28,260–28,287, 38,580–38,582, 38,583, 39,-125–39,129 (1974) ).

Section 2614 is also clearly distinguishable from a non-jurisdictional statute of limitations. The *Hardin* Court compares § 2614 to 15 U.S.C. § 15b. 797 F.2d at 1040. Section 15b provides:

Any action to enforce any cause of action under sections 15, 15a, or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued....

15 U.S.C. § 15b (1982). "Unlike the 'JURISDICTION OF COURTS' subtitle of § 2614, the subtitle that Congress applied to § 15b was 'Statute of Limitations.' " *Hardin, supra*, 797 F.2d at 1040 (citing Pub.L. No. 84–137, § 4B, 69 Stat. 282, 282–83 (1955) ). Moreover, unlike the time limitation in § 2614, "§ 15b is set apart from the Act's jurisdictional provisions...." *Id.* Thus, § 15b has been held to be not jurisdictional, but rather is a statute of limitations, affirmative defense, subject to equitable tolling under the doctrine of fraudulent concealment. *See King & King Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147, 1154–56 (10 Cir.1981), *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982); *cf. Davis v. Bryan*, 810 F.2d 42 (2d Cir.1987).

The Circuit Court then turned, as this Court must do, to the next question, whether the "jurisdictional time limitation of § 2614 is subject to equitable tolling." The Supreme Court has held that the doctrine of equitable tolling "is read into *every* federal statute of limitation." *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946) (emphasis added). "It is equally clear, however, that Congress can set jurisdictional time prerequisites to

the entertainment of federal claims." *Hardin, supra,* 797 F.2d at 1040. Therefore, the Court must determine whether § 2614, RESPA's jurisdictional time limitation, is subject to equitable tolling. *Cf. Jones v. Trans-Ohio Savings Ass'n,* 747 F.2d 1037, 1041 (6th Cir.1984).

It is clear that jurisdictional provisions in federal statutes are to be narrowly construed. *Cf. United States v. Tillamooks,* 329 U.S. 40, 45, 67 S.Ct. 167, 169, 91 L.Ed. 29 (1946); *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 178–79, 78 S.Ct. 1097, 1109–10, 2 L.Ed.2d 1228 (1958) (Frankfurter, J., dissenting); *Blackfeather v. United States,* 190 U.S. 368, 376, 23 S.Ct. 772, 775, 47 L.Ed. 1099 (1903); *United States v. Cumming,* 130 U.S. 452, 455, 9 S.Ct. 583, 584, 32 L.Ed. 1029 (1889). In *Finn v. United States,* 123 U.S. 227, 8 S.Ct. 82, 31 L.Ed. 128 (1887), the Supreme Court was required to construe a federal statute conferring jurisdiction upon the Court of Claims to hear certain causes of action, subject to the limitation that the claim be brought "within six years after the claim first accrues[.]" *Id.* at 229, 8 S.Ct. at 83. The Court held this limitation to be jurisdictional and that it could be tolled only as provided in the statute. *Id.* at 232, 8 S.Ct. at 85. *See also United States v. Wardwell,* 172 U.S. 48, 52, 19 S.Ct. 86, 88, 43 L.Ed. 360 (1898).

 "Where a time limitation is jurisdictional, it must be strictly construed and will not be tolled or extended on account of fraud." *Hardin, supra,* 797 F.2d at 1040–41 (citing *United States ex rel. Nitkey v. Dawes,* 151 F.2d 639, 642–44 (7th Cir.1945), *cert. denied,* 327 U.S. 788, 66 S.Ct. 808, 90 L.Ed. 1015 (1946)). Neither the plain language of § 2614 nor its legislative history establishes any foundation for the equitable tolling of its jurisdictional time limi-

tation. The *Hardin* Court correctly concluded that "where as here, a time limitation is jurisdictional, the doctrine of equitable tolling does not apply." 797 F.2d at 1041. Accordingly, plaintiffs' assertions of fraudulent concealment are rejected. Since it is undisputed that plaintiffs' claims, pursuant to RESPA, were filed after the one-year period, this Court holds that they are barred by § 2614, and are therefore dismissed.[4]

### The Statute of Limitations for Civil RICO Claims

Plaintiffs' second through fifth claims allege that defendant violated RICO. 18 U.S.C. § 1962(a)–(d). "RICO sets up a federal scheme that 'seek[s] the eradication of organized crime in the United States ... by establishing new penal prohibitions, . ... and new remedies to deal with unlawful activities of those engaged in organized crime.'" *Bartels v. Clayton Brokerage Co. of St. Louis,* 631 F.Supp. 442, 448 (S.D.N.Y.1986) (Goettel, J.) (quoting *Durante Bros. & Sons, Inc. v. Flushing National Bank,* 755 F.2d 239, 248 (2d Cir.), *cert. denied,* 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985)). Defendant contends that plaintiffs' RICO claims are barred by the applicable statute of limitations.

RICO does not contain a specific statute of limitations governing civil RICO actions —"'a void which is commonplace in federal statutory law.'" *Wilson v. Garcia,* 471 U.S. 261, 266, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254 (1985) (quoting *Board of Regents v. Tomanio,* 446 U.S. 478, 483, 100 S.Ct. 1790, 1794, 64 L.Ed.2d 440 (1980)). In the event that Congress has not set forth a limitations period for a federal cause of action, the accepted procedure is to "borrow" the most appropriate statute

---

**4.** In light of this decision, the Court does not reach defendant's argument that, even if equitable tolling for reasons of fraudulent concealment were appropriate under RESPA, plaintiffs have failed to plead adequately sufficient circumstances to warrant such a tolling.

Plaintiffs' third argument, that if the Court applies the RESPA one year statute of limita-

tions to plaintiffs it should be tolled because defendant has engaged in a continuous course of tortious conduct, is also rejected for the reasons stated *supra* and because plaintiffs have failed to show any continuous tortious conduct related to RESPA.

of limitations of the forum state if it is not inconsistent with federal practice. *See, e.g., Wilson, supra,* 471 U.S. at 266–67, 105 S.Ct. at 1942–43. *Tomanio, supra,* 446 U.S. at 483–84, 488, 100 S.Ct. at 1794–95, 1797; *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295; *see generally* Note, Limitation Borrowing in Federal Courts, 77 Mich.L.Rev. 1127 (1979).

In the instant action, defendant first urges the Court to apply the one-year jurisdictional limitation contained within RESPA. It relies on *Bartels, supra,* 631 F.Supp. at 442. In the alternative, defendant requests the Court to employ the three-year New York statute of limitations governing actions to enforce a liability created by statute. N.Y.Civ.Prac. Law ("CPLR") § 214(2) (McKinney 1972). Defendant relies on *Durante, supra,* 755 F.2d at 239, for the proposition that § 214(2) is applicable to civil RICO claims regardless of the basis of the particular allegation. Plaintiffs, in contrast, assert that the Court should apply the six-year statute of limitations governing an action based on fraud. CPLR § 213(8). They argue that *Durante* does not require the uniform application of a three-year statute of limitations to all civil RICO actions. Rather, plaintiffs insist that the Court select a proper time period for each RICO claim depending upon the nature of the predicate acts.

*Durante* is the only case in which the Second Circuit Court of Appeals has considered the borrowing of statutes of limitations for RICO claims. The Courts in this District, however, have not found *Durante* to be dispositive of the issue now before the Court. *See, e.g., Bankers Trust Co. v. Feldesman,* 65 B.R. 470, 481 (S.D.N.Y. 1986); *Fustok v. Conti-Commodity Services, Inc.,* 618 F.Supp. 1076 (S.D.N.Y.1985). In *Durante,* the plaintiff brought a civil RICO action predicated upon the alleged collection of an unlawful debt. The District Court held that the most appropriate time period was the one-year New York statute governing actions to recover an overcharge of interest, namely CPLR § 215(6), and dismissed the plaintiff's ac-

tion as untimely. Noting that the District Court's apparently proper analogy fell when the RICO claim's elements were more closely examined, the Circuit Court reversed the District Court. The Court of Appeals pointed out that plaintiff would have to establish at least ten elements to state his RICO claim, while the state law claim under § 215(6) required only proving one of the ten. The Second Circuit then held that,

> There being no state law analog to the present civil RICO claim, we conclude that the most appropriate state statute is that found in CPLR § 214(2), governing actions to enforce a liability created by statute.

755 F.2d at 249.

Four decisions in this District, subsequent to *Durante,* have addressed the issue of the borrowing of statutes of limitations in the context of civil RICO. In all four cases the Court had to decide whether a uniform statute of limitations should be applied to all civil RICO claims or whether a case-by-case analysis was more appropriate.

Judge Lasker, in *Fustok, supra,* 618 F.Supp. at 1076, was confronted with the following facts: plaintiff brought a civil RICO action alleging that defendants had engaged in a pattern of racketeering activity by performing the predicate acts of mail and wire fraud. Defendant, relying on *Durante,* moved to dismiss the RICO claim as time barred because it was filed after the three-year limitation period of CPLR § 214(2), uniformly applicable to all civil RICO claims. The plaintiffs countered by insisting that the limitations period applicable to the RICO claims varied as a function of the offense underlying each RICO claim. Judge Lasker opined that he found *Durante* "puzzling in that it [was] not clear to [him] whether the court intended to establish a general rule for RICO limitation periods," and noted that "in any event the opinion does not state a rule of general applicability *in haec verba.*" 618 F.Supp. at 1081. Therefore, Judge Lasker examined decisions of the various federal dis-

tricts and Circuits which preceded *Durante*. Judge Lasker correctly observed that the decisions were divided but still concluded that there was "considerable authority ... to support the proposition that the New York statute of limitations governing the state action which most closely resembles the basis for the RICO claim should apply." *Id.* Judge Lasker agreed with plaintiff that the six-year New York period of limitation governing actions based on fraud was most appropriate.[5]

Judge Walker, in *Von Bulow v. Von Bulow*, 634 F.Supp. 1284 (S.D.N.Y.1986), confronted a question similar to that faced by Judge Lasker. However, Judge Walker did not deem it necessary to reach the issue because due to tolling the action was timely regardless of what was the applicable period. In dictum, nonetheless, Judge Walker stated that he was "inclined to the view that the Second Circuit did not intend a uniform rule and to agree with Judge Lasker in *Fustock.*" *Id.* at 1301.

The third decision following *Durante* is *Bartels, supra,* 631 F.Supp. at 442. In that action, before Judge Goettel, the plaintiffs again brought a civil RICO action alleging that defendants had committed predicate acts of mail and wire fraud in furtherance of a commodities fraud scheme. Judge Goettel conceded that generally, in the absence of a specific limitation period in a federal statute, the court borrows an analogous state limitations period. However, Judge Goettel noted that "when federal policies are at stake, courts have not hesitated to look for a timeliness rule in federal law that provides a closer analogy." *Id.* at 449 (citing *DelCostello v.*

*International Bhd. of Teamsters*, 462 U.S. 151, 171–72, 103 S.Ct. 2281, 2294–95, 76 L.Ed.2d 476 (1983)). Because RICO was enacted in furtherance of a *national* policy to battle organized crime, Judge Goettel held that its enforcement should thus proceed in a uniform manner. In light of this need for uniformity and the fact that plaintiffs' claims were founded upon violations of the Commodities Exchange Act (the "CEA"), Judge Goettel selected the two-year statute of limitations applicable to private actions under the CEA. "Although this is not clear from Judge Goettel's opinion, it appears likely that he was suggesting that, where the predicate offenses are federal, courts should choose the appropriate federal statute of limitations rather than the state statute applicable to the most analogous state claim." *Feldesman, supra,* 65 B.R. at 483.

The fourth opinion following *Durante* is *Feldesman, supra,* 65 B.R. at 470, decided by Judge Connor. After an exhaustive review of the aforementioned decisions, Judge Connor turned to these same difficult questions. Judge Connor interpreted *Durante* as suggesting that the District Court should first look to state law. Judge Connor notes that "[t]he [Circuit Court] was presumably aware of and rejected the option of borrowing from a federal statute." *Feldesman, supra,* 65 B.R. at 483. Judge Connor also stated that "the great weight of authority is that state law is the appropriate source from which to borrow the limitation period for civil RICO claims." *Id.* (citations omitted). The Court also pointed out that to its knowledge "only Judge Goettel, in *Bartels* [*supra,* 631 F.Supp. at 442] and Judge Sloviter, concurring in the judgment in *A.J. Cunningham*

5. Judge Conner noted in *Feldesman* that:
 [I]t is not clear to what extent Judge Lasker based his decision on "strong, practical considerations." Judge Lasker noted that the case was "about ready to go to trial," "that the bulk of discovery [had been completed]," and that proof of the RICO allegations would not add significantly to the length of the trial. In contrast, he observed that "[d]ismissal of the RICO claim would run the risk of a costly retrial in the event that the Court of Appeals subsequently clarifies its position on the ap-

propriate limitations period in agreement with plaintiff's understanding." "Bearing in mind these legal and policy considerations," Judge Lasker concluded that the motion to dismiss the RICO claim as time-barred should be denied. 618 F.Supp. at 1081.
65 B.R. at 482 n. 3. In fact, Judge Lasker has recently departed from his holding in *Fustok* and now shares Judge Conner's position in *Feldesman. Korwek v. Hunt,* 646 F.Supp. 953, 970–71 (S.D.N.Y.1986).

*Packing Corp. v. Congress Financial Corp.,* 792 F.2d 330 (3d Cir.1986) have looked to federal law." *Id.* (citations omitted). Finally, Judge Connor reminds us that, even in *DelCostello,* where the Supreme Court chose a federal statute, the Court still "stated that 'resort to state law remains the norm for borrowing of limitations periods,' [citation omitted] and that 'absent some sound reason to do otherwise, Congress would likely intend that the courts follow their previous practice of borrowing state provisions.'" *Id.* (quoting *DelCostello, supra,* 462 U.S. at 171, 158 n. 12, 103 S.Ct. at 2294, 2287 n. 12). In sum, Judge Connor was "not persuaded that courts should look to federal rather than state law." *Id.*

The next question before Judge Connor—once he had decided to borrow a state statute of limitations—was "whether to treat all civil RICO claims similarly, without considering the factual circumstances presented in each case, and to apply the same statute of limitations to all RICO claims, or to characterize each RICO claim on the basis of its particular factual underpinnings and to apply that statute which is most analogous in each case." *Id.* Agreeing with the previous decisions that *Durante* is not dispositive, Judge Connor turned to the decisions of the other Courts of Appeals. He first noted that the Circuits are divided on this question; more specifically, the two Circuits who have directly decided the issue have reached opposite conclusions. *See Malley-Duff & Assocs. v. Crown Life Ins. Co.,* 792 F.2d 341, 349 (3d Cir.), *cert. granted,* —— U.S. ——, 107 S.Ct. 569, 93 L.Ed.2d 573 (1986), ("[I]n borrowing state limitations periods for civil RICO claims courts must select, in each state, the *one* most appropriate statute of limitations for *all* civil RICO claims.") (emphasis in original); *Silverberg v. Thomson McKinnon Sec., Inc.,* 787 F.2d 1079, 1083 (6th Cir. 1986) ("[T]he selection of the applicable state limitations period in the individual case should be made on the basis of a characterization of the kind of factual circumstances and legal theories presented.")

Judge Connor also suggested that the Ninth and Eleventh Circuits would also apply a single state limitations period to all RICO claims. *Feldesman, supra,* 65 B.R. at 484 (citing *Compton v. Ide,* 732 F.2d 1429, 1433 (9th Cir.1984); *Hunt v. American Bank & Trust Co.,* 783 F.2d 1011, 1014 n. 4 (11th Cir.1986) ). With respect to the District Courts, Judge Connor detected a trend towards the adoption of the uniform approach. *See, e.g., Louisiana Power & Light Co. v. United Gas Pipe Line Co.,* 642 F.Supp. 781 (E.D.La.1986); *Fink v. Meserve, Mumper & Hughes,* 84 Civ. 10382 (PHM) (N.D.Ill. June 19, 1986) [Available on WESTLAW, DCTU database]; *HMK Corp. v. John Walsey,* 637 F.Supp. 710 (E.D.Va.1986). This Court, after reviewing all the aforementioned cases, agrees with Judge Connor, that Judge Higginbotham's "well-reasoned and scholarly opinion" in *Malley-Duff, supra,* 792 F.2d at 341 is the most persuasive.

In *Malley-Duff,* the Third Circuit applied the three-part inquiry established in *Wilson.* 792 F.2d at 345 (citing *Wilson, supra,* 471 U.S. at 267, 105 S.Ct. at 1942). First the Court of Appeals examined whether federal or state law governs the characterization of civil RICO claims for statute of limitations purposes. It noted that the characterization of RICO claims " 'is derived from the elements of the cause of action and Congress' purpose in providing it,'" and that " '[t]hese, of course, are matters of federal law.'" *Malley-Duff, supra,* 792 F.2d at 346 (quoting *Wilson, supra,* 471 U.S. at 268, 105 S.Ct. at 1943). Thus, the matter of characterization is a federal question. *Malley-Duff, supra,* 792 F.2d at 346. In addition, the Third Circuit concluded that "the federal interests in uniformity and having 'firmly defined, easily applied rules,'" is as applicable to RICO, as it is to other federal statutes. *Id.* (quoting *Wilson, supra,* 471 U.S. at 270, 105 S.Ct. at 1944).

The Court of Appeals then balanced the factors that persuaded the Supreme Court

in *Wilson* to choose a uniform limitations period for § 1983 actions. The Third Circuit concluded that the Supreme Court's reasoning in § 1983 cases paralleled that presented in the RICO context. The Court of Appeals relied on the fact that RICO claims differ significantly from any simple state law claims because "[c]oncepts such as RICO 'enterprise' and 'pattern of racketeering activity' were simply unknown to common law, and all federal crimes contain jurisdictional and other elements irrelevant to any state civil action." *Malley-Duff, supra,* 792 F.2d at 348. Thus, "as with § 1983, any analogies to traditional state causes of action 'are bound to be imperfect.'" *Id.* (quoting *Wilson, supra,* 471 U.S. at 272, 105 S.Ct. at 1945).

In addition, the Third Circuit highlighted the potential problem of multiple limitations periods applicable to each claim. The Court explained:

> Even RICO claims based on "garden variety" business disputes might be analogized to breach of contract, fraud, conversion, tortious interference with business relations, misappropriation of trade secrets, unfair competition, usury, disparagement, etc., with a multiplicity of applicable limitations periods. A state may even have different limitations periods for common law fraud and securities fraud.

*Malley-Duff, supra,* 792 F.2d at 348 (citations omitted). The Court of Appeals therefore held "that in borrowing state limitations periods for civil RICO claims courts must select, in each state, the *one* most appropriate statute of limitations for *all* civil RICO claims." *Id.* at 349 (emphasis in original).

At the third and final stage of the analysis—the selection of the state statute to govern civil RICO actions—the Court of Appeals selected among four state statutes of limitations, the most relevant for purposes of the instant action being the statute governing common law fraud actions and the "catchall" six-year residual statute of limitations. The Court easily rejected the common law fraud analogy because it

held that it "'falls far short of capturing the multitude of factual bases on which RICO can be based'" *id.* at 351, (quoting *Electronic Relays (India) Pvt. Ltd. v. Pascente,* 610 F.Supp. 648, 651 (N.D.Ill.1985)), concluding that "characterizing RICO as essentially a fraud action would be to have the tail wag the dog." *Id.* Although the Third Circuit was aware that in *Wilson,* the Supreme Court had considered and rejected application of a catch-all statute of limitations to § 1983 actions, it found that:

> The Court's reasons for rejecting this analogy in the § 1983 context simply do not apply to RICO. RICO was enacted in 1970, long after statutory causes of action and corresponding catchall limitations periods became commonplace. Thus, it would not be disingenuous (or anachronistic) to suggest that Congress might have approved of borrowing such statutes. Second, RICO is a strictly statutory remedy to enforce statutory rights.

*Malley-Duff, supra,* 792 F.2d at 352. The Court also explained that:

> Such an approach ... recognizes that civil RICO is truly *sui generis* and that particular claims cannot be readily analogized to causes of action known at common law—the very observation that led us to search for a uniform limitations period in the first place. And like personal injury statutes, the catchall statutes are particularly unlikely to be fixed in a manner that would discriminate against federal claims.

792 F.2d at 353.

This Court agrees with the Third Circuit and with Judge Connor that it should select "the one most appropriate statute of limitations for all civil RICO claims." 792 F.2d at 349; *accord Teltronics Servs.,* 587 F.Supp. 724 [E.D.N.Y.1984]. In so doing, this Court first rejects § 213(8), governing actions based upon fraud—the provision proposed by plaintiffs—for reasons identical to those denoted by the Third Circuit in *Malley-Duff, supra,* 792 F.2d at 351. The Court also rejects New York's "omnibus" statute, § 213(1)—not suggested by either party—

because the Second Circuit has held that § 213(1) "has generally been understood to govern only actions for equitable relief." *Pauk v. Board of Trustees*, 654 F.2d 856, 863 (2d Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982). Instead, the Court joins Judge Connor in holding that the most "compelling analogy to civil RICO claims" is CPLR § 214(2), encompassing actions based upon a "liability ... created or imposed by statute[ ]", which provides for a three-year statute of limitations. *Feldesman, supra*, 65 B.R. at 488.

Section 214(2) is the most appropriate analog to RICO because it is "applicable to actions for wrongs not recognized in the common or decisional law." *State v. Cortelle Corp.*, 38 N.Y.2d 83, 86, 378 N.Y.S.2d 654, 656, 341 N.E.2d 223, 224 (1975). In addition, prior to *Wilson*, § 214(2) was applied to § 1983 actions in this Circuit. *See Pauk, supra*, 654 F.2d at 866. Finally, this is the provision that the Second Circuit deemed most appropriate in *Durante*. Thus, to this extent, this choice may be deemed consistent with the *Durante* Court's decision.

### Accrual of Civil Rico Claims

 The Court must now decide at what point plaintiffs' RICO claims accrued. State law determines the duration of the limitation period, and the conditions under which the period is tolled. *See, e.g., Wilson, supra*, 471 U.S. at 269 & n. 17, 105 S.Ct. at 1943 & n. 17. Federal law, however, determines the date on which the period commences to run. *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir.1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981). The general rule is that the limitations period begins to run when a plaintiff knows or has reason to know of the injury that is the basis for his action. *Id.*

This general rule is problematic when applied to RICO for two reasons. "First, a plaintiff may be injured before he has the right to sue under RICO." *Feldesman, supra*, 65 B.R. at 489. "Second, unlike most federal claims, which involve a single injury, a civil RICO claim will often involve multiple injuries." *Id.* Therefore, in the context of RICO, it is often appropriate to invoke a recognized exception to the general rule. "Under this exception, an action is timely as long as the last act evidencing the continuing practice falls within the limitation period, and courts will grant relief with respect to earlier related acts that would otherwise be time barred." *Id.* at 490.

### The Timeliness of Plaintiffs' RICO claims

The Court must now determine whether plaintiffs' RICO claims are timely under the above standards. Moll alleges that the last RICO predicate act specifically committed by an alleged member of the enterprise with respect to her claim occurred on October 13, 1982. On that date Feeney sent a letter to the Molls enclosing their title insurance policy from US Life. Moll Complaint ¶ 80(a). The Moll action was filed on August 29, 1985, less than three years after the alleged final predicate act. Therefore, Moll's RICO claims are timely.

The last RICO predicate act committed by a member of the enterprise which allegedly involved plaintiff Elser occurred on May 4, 1983. On that date, Feeney sent a letter to Elser enclosing his title insurance policy from US Life. The Elser action was filed on May 30, 1986, more than three years after the alleged final predicate act. Therefore, Elser's RICO claims are, on their face, time-barred.

The last RICO predicate act committed by a member of the enterprise which allegedly involved plaintiff McGuire occurred on October 8, 1982. Again, on that date, Feeney sent a letter to McGuire enclosing directions for payment of closing costs. McGuire's action was brought with Elser on May 30, 1986, more than three years after this date. Thus, it appears that his RICO claims are untimely.

The last RICO predicate act committed by a member of the enterprise which allegedly involved the Harlows occurred on March 23, 1984. On that date, Feeney sent a letter to the Harlows enclosing their title insurance policy from US Life. The Har-

lows' action was brought with Elser on May 30, 1986, less than three years after this date. Therefore, their RICO claims are timely.

In sum, the RICO claims of plaintiffs McGuire and Elser appear to be time-barred, while the claims of the Harlows and the Molls are timely. However, rather than dismissing McGuire and Elser at this early stage of the litigation, the Court will permit McGuire and Elser to replead their RICO claims within sixty days if they can allege with greater specificity acts which would remove the time barrier to their actions. *See, Feldesman, supra,* 65 B.R. at 491.

### Plaintiffs' Fraud Claims Fail to State Valid Causes of Action

Defendant moved to dismiss all of plaintiffs' non-RESPA claims, grounded in a claim of fraud, for failure to state a claim upon which relief may be granted. Undoubtedly, "[f]raud ... is 'infinite in variety.'" *United States v. Mangan,* 575 F.2d 32, 36 (2d Cir.) (Friendly, J.), *cert. denied,* 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978) (quoting Lord Macnaghten in *Reddaway v. Banham,* [1896] A.C. 199, 211). Nonetheless, to state such a claim, New York Law requires pleading of the "traditional five elements of fraud: misrepresentation of a material fact, falsity of that representation, *scienter,* reliance and damages." *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980) (Friendly, J.), *cert. denied; see also Freschi v. Grand Coal Venture* 551 F.Supp. 1220 (S.D.N.Y.1982); *Indees v. American University of the Caribbean,* 546 F.Supp. 1342 (S.D.N.Y.1982); *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 545 F.Supp. 1314 (S.D.N.Y.1982); *Channel Master Corp. v. Aluminum Limited Sales, Inc.,* 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958); *Ochs v. Woods,* 221 N.Y. 335, 338, 117 N.E. 305 (1917); *Chase Manhattan N.A. v. Perla,* 65 A.D.2d 207, 411 N.Y.S.2d 66 (4th Dept.1978).

Plaintiffs argue that they have stated "common law and RICO claims ... based on three distinct theories of fraud:

(a) Defendant misrepresented the premium charged for its title insurance;

(b) Defendant aided and abetted attorneys in breaching their fiduciary obligations to plaintiffs and the proposed class; and

(c) Defendant had a duty to disclose to plaintiff and the members of the proposed class the payments of kickbacks to their attorneys."

P. Elser Memo. at 14.

### Plaintiffs Theory of Misrepresentation

Plaintiffs claim that the defendant misrepresented to them "that the premium for title insurance was set by law and then [US Life] accepted an amount substantially less than the 'set' rate" in connection with the Moll, Elser, Harlow, and McGuire transactions. P. Moll Memo. at 28. As a threshold matter, defendant correctly points out that the rates charged for title insurance *are* set by law. Moreover, plaintiffs concede that they paid to US Life the exact premium *mandated* by the New York State Insurance Department. Plaintiffs' claims of misrepresentation are actually based on defendant's failure to disclose to plaintiffs how that payment would be apportioned.

Nowhere in their complaints do plaintiffs allege that US Life *represented* that it was "'accepting' (*i.e.,* retaining for its own account) the premium charged." D. Elser Memo. 14. The complaints do state that US Life charged the plaintiffs a certain premium for their title insurance, *see, e.g.,* Elser Complaint, ¶¶ 42, 53, 64, however, plaintiffs fail completely to plead any facts indicating whether defendant or any agent of defendant ever discussed with plaintiffs what US Life would do with the premiums. Plaintiff's conclusory allegations that defendant "made material false and fraudulent representations" are insufficient.

Plaintiffs also argue that US Life was under a statutory obligation not to accept a premium below that stated in its filings with the New York State Department of Insurance. Plaintiffs claim that US Life allegedly made this filing cognizant of the

fact that it would receive a lesser net fee from the business referred to it by the alleged enterprise. Plaintiffs also conclusorily allege that they relied on the representation of defendant that it would only accept this approved rate of payment, *see, e.g.,* Moll Complaint ¶¶ 37–38, 99–101, and were consequently harmed.

This additional theory of plaintiffs is similarly unconvincing. US Life does not make filings with the New York State Department of Insurance. The relevant filings are actually made by the New York Board of Title Underwriters based on aggregate data provided by various title insurance companies. Moreover, as defendant notes:

> In any event, any representations in the rate filings, even if they somehow could be attributed to US Life, were made to the Department, not to plaintiffs, and plaintiffs have no standing to challenge here the representations made to a state agency. Indeed, the New York State Insurance Law specifically provides the Superintendent of Insurance—not individual purchasers—with extensive supervisory and enforcement powers to ensure (1) that the rates are proper before it approves them and (2) that the title insurance companies comply with the approved rate schedules.

D. Elser Reply Memo. at 15. N.Y. Insurance Law § 6409(b).

*Plaintiffs' Duty of Disclosure Theory*

Plaintiffs also base their fraud claims on defendant's alleged failure to disclose to plaintiffs the payments of rebates to their attorneys. The Second Circuit has "expressly held that, under New York law, a duty to disclose material facts is triggered: 'first where the parties enjoy a fiduciary relationship ... and second, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" *Grumman Allied Industries v. Rohr Industries, Inc.,* 748 F.2d 729, 738–739 (2d Cir.1984) (quoting *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 123 (2d Cir.

1984)); *see also Frigitemp Corp. v. Financial Dynamics Fund,* 524 F.2d 275, 283 (2d Cir.1975).

Plaintiffs claim that there is a "longstanding principle" that an insurer is a fiduciary of its insured. P. Moll Memo. at 33. Plaintiffs rely on *Hartford Accident & Indemnity v. Michigan Mutual Ins. Co.,* 93 A.D.2d 337, 462 N.Y.S.2d 175, 178 (1st Dep't 1983), *aff'd,* 61 N.Y.2d 569, 475 N.Y. S.2d 267, 463 N.E.2d 608 (1984); *Faraino v. Centennial Ins. Co.,* 117 Misc.2d 297, 458 N.Y.S.2d 444, 447 (Kings Co.Sup.Ct. 1982), *rev'd on other grounds,* 103 A.D.2d 790, 477 N.Y.S.2d 664 (2d Dep't 1984), as support for this proposition. However, these cases cannot be so broadly construed.

In *Hartford Accident,* the court merely upheld the sufficiency of a claim that the primary liability insurer breached its fiduciary duty to the excess liability insurer by failing to join the employee of the injured worker in the suit by the worker against the employer's parent. Similarly, in *Faraino,* the plaintiff-insured claimed that the insurer failed to properly defend the insured's interest because the insurer had refused to bring suit against the original defendant who caused damage to the insured. Thus, plaintiffs' proposed principle is limited to cases where the liability insurer is required to represent the insured's interests in a lawsuit and is inapposite to the instant matter.

In *Grumman Allied, supra,* 748 F.2d at 729, the Second Circuit held that an ordinary business relationship cannot be transformed into a fiduciary relationship without an expectation of trust and confidence. The obvious fiduciary relationships in this case exist between the purchasers and their examining attorneys. The relationship between US Life and the purchasers can best be characterized as merely contractual, paralleling that between a debtor-creditor or a business-customer. *See Aaron Ferer supra,* 731 F.2d at 122 (no fiduciary relationship exists between a bank and its customer); *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.,* 601 F.Supp. 770, 772 (S.D.N.Y.1985) (no fiduci-

ary relationship exists between two parties contracting at arm's length). In fact, if, as plaintiffs claim, US Life was allegedly purchasers' fiduciary, examining counsel on behalf of the purchasers seem superfluous. In addition, plaintiffs fail to plead specific facts alleging that any particular trust or confidence was placed in US Life by plaintiffs. The Court also notes that it is logical to expect that purchasers of title insurance policies—all potential claimants under a first party insurance plan—necessarily anticipate taking a future position antagonistic to the insurer, upon the chance that a claim is eventually filed.

■ In sum, because in this case the first party insurance contracts exist between the plaintiffs and defendant, the Court refuses to impose a fiduciary relationship upon the parties. Therefore, there was no fiduciary duty to disclose owned by defendant to plaintiffs.[6]

Plaintiffs also argue, albeit briefly, that they have pleaded adequately the alternative basis for fraud under New York common law, that defendant knew that plaintiffs were acting upon a mistaken belief as to a material fact and did not so inform plaintiffs. Plaintiffs have alleged clearly that US Life did not tell plaintiffs that the premiums included rebates. However, nowhere in their complaints do plaintiffs allege specifically that defendant knew that plaintiffs were not aware that some portion of the premiums were being paid to plaintiffs' counsel in the form of rebates. The Court, however, grants plaintiffs leave to amend their complaints so as to allege this element of their fraud claim.

In addition, defendant claims that even if plaintiffs can establish the first element pertaining to knowledge, they still cannot state a claim under this alternative doctrine of fraud, because plaintiffs cannot show that the information concerning the rebate is material. Defendant argues that as a

matter of law—regardless of the alleged kickbacks—plaintiffs could not have obtained title insurance at a lower price than that charged by US Life. Plaintiffs cannot deny that US Life is "required to charge the same rate to every applicant whose title has the same risk classification, based upon a rate schedule approved by the New York State Superintendent of Insurance." D. Elser Memo. at 22 (citing N.Y.Ins.Law § 6409). Therefore, defendant concludes, the failure of US Life to disclose the alleged rebates cannot be material because such information would not affect the price paid by plaintiffs.

■ Although defendant's argument is superficially appealing, the Court notes that there are elements affecting consumer choice other than price. Plaintiffs might have chosen to purchase title insurance from a competitor of US Life for various reasons (for example, US Life might not be as financially secure as its competitors) if plaintiffs had investigated the various companies. However, plaintiffs relied on their "tainted" counsel to select their title insurance company for them. It is conceivable that if plaintiffs were aware that their attorneys were paid a fee for referring business to US Life, they might not have agreed so readily to buy their insurance from US Life. Therefore, the Court hereby permits plaintiffs another opportunity, at this early stage of the litigation, to plead that the alleged nondisclosures on the part of US Life are material.

*Plaintiffs' Aiding and Abetting Theory*

Plaintiffs' third theory of fraud is that US Life aided and abetted the attorneys in breaching their fiduciary obligation to plaintiffs and the members of the proposed class. Plaintiffs argue that US Life's participation in the alleged fraudulent scheme destroyed the attorney-client relationships which were relied upon by plaintiffs.

---

**6.** The Court also rejects plaintiffs' claim that defendant had a statutory obligation to disclose the alleged referral payment. Although plaintiffs are quite correct that one of the purposes of RESPA is to reform the real estate settlement process in order to provide consumers with more information regarding settlement costs, plaintiffs are unable to cite any specific provision of RESPA which mandates disclosure or establishes a "materiality" standard.

It cannot be disputed that examining attorneys, in the course of their representation of home purchasers are ethically prohibited from accepting any money or thing of value from title insurance companies without first obtaining the express consent of their clients. *See In re Equitable Office Bldg. Corp.*, 83 F.Supp. 531 (S.D.N.Y.1949) (Chief Judge Knox), *rev'd. on other grounds,* 175 F.2d 218 (2d Cir.1949); New York State Opinion 351 (1974); New York State Opinion 320 (1973); ABA Comm. on Ethics and Professional Responsibility, Opinion 394 (1962); *The Lawyer's Code of Professional Responsibility,* New York Judiciary Law (Appendix) DR 1–102(A)(4), EC 5–16, DR 5–101(A), DR 5–107(A) and EC 6–1 (McKinney 1975). Such circumstances have recently been analyzed by the Committee on Professional Ethics of the New York State Bar Association. This opinion clearly states that examining counsel who receive money from title insurance companies, without the express consent of their clients, are acting unethically and illegally. *See* New York State Opinion 576, pp. 8, 9 (June 25, 1986). This is especially true where "an attorney-agent performs no significant additional services in return for his portion of the premium...." *Id.* at 7.

■■■ It is well settled law in this Circuit that a common law action exists for aiding and abetting. To make out such a claim, a plaintiff is required to allege:

(1) the existence of a violation committed by the primary (as opposed to the aiding and abetting) party;

(2) "knowledge" of this violation on the part of the aider and abettor; and

(3) "substantial assistance" by the aider and abettor in achievement of the violation.

*See Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 62 (1985); *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983); *ITT v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980); *Beneficial Commercial supra,* 601 F.Supp. at 772.

■■■ Defendant argues quite convincingly that plaintiffs have failed to plead adequately in their complaints the requisite

elements to state a claim for aiding and abetting. However, a fair reading of the complaints reveals sufficient underlying facts so that the Court cannot hold at this early stage of this litigation that plaintiffs could *not* prove their aiding and abetting claim. The complaints generally allege that the examining attorneys were fiduciaries of plaintiff. The pleadings also claim that the attorneys failed to disclose to their clients the fact that they were receiving rebates from US Life. Although the complaints only conclusorily allege that US Life had knowledge of, and aided in, the examining attorneys' alleged defrauding of their clients, this is sufficient as a basis to allow plaintiffs one last chance to amend their complaints to allege more precisely their aiding and abetting claim.

*Plaintiffs' RICO Claims Fail to State Valid Causes of Action*

Defendant has not only argued that plaintiffs' RICO claims are untimely and that plaintiffs fail to state underlying actions for fraud, but it has also attacked certain elements in plaintiffs' RICO claims. As this Court has already noted, RICO was enacted in 1970 "to seek the eradication of organized crime in the United States ... by providing new remedies to deal with unlawful activities of those engaged in organized crime." 116 Cong.Rec. 35191 (1970). Section 1964(c) provides a private civil right of action for violation of the statute. It states that anyone "injured" "by reason of" a violation of § 1962 is entitled to treble damages. The violations covered under § 1962 include conducting "enterprises" "through a pattern of racketeering." 18 U.S.C. § 1962(c). A "pattern of racketeering" is defined as two or more "acts of racketeering" occurring within a ten-year period. *Id.* Predicate "racketeering activity" is defined, *inter alia,* as an "offense" under the mail and wire fraud statutes. 18 U.S.C. §§ 1341, 1343.

In *Moss v. Morgan Stanley Inc.,* 553 F.Supp. 1347 (S.D.N.Y.), *aff'd,* 719 F.2d 5 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984),

Judge Pollack described the substantive prohibitions of RICO as follows:

> The proscribed activities under RICO are described in Section 1962 and enumerated in Section 1961. These are aimed at structured criminal organizations who fund, acquire or maintain enterprises engaged in or affecting interstate or foreign commerce with the proceeds of illegal activities by "(a)" investing income derived from a "pattern of racketeering" in an enterprise or "(b)" acquiring or maintaining an enterprise through "a pattern of racketeering," or "(c)" being employed by or associated with an "enterprise" to conduct or participate "in the conduct of such enterprises's affairs through a pattern of racketeering," or "(d)" to conspire to violate any of the foregoing. (Section 1962).

*Id.* at 1360. Defendant claims that plaintiffs' allegations are "wholly inadequate to support a claim that any of such violations occurred here." D. Elser Memo. at 24.

### The Enterprise

 Defendant argues that plaintiffs have failed in their attempt to "mold an amorphous group of real estate attorneys and other individuals and corporations 'engaged in the real estate settlement industry in ... New York' into a criminal 'enterprise.'" *Id.* at 25 (quoting Elser Complaint ¶ 105.) In this Circuit, for an association of individuals to constitute an "enterprise" for purposes of RICO, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes. *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 22–23 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *United States v. Mazzei,* 700 F.2d 85, 89–91 (2d Cir.), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983); *United States v. Errico,* 635 F.2d 152, 156 (2d Cir.1980), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1982); *Beth Israel Medical Center v. Smith,* 576 F.Supp. 1061, 1067–68 (S.D.N.Y.1983).

As the Supreme Court stated in *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981):

> [t]he enterprise is an entity, for present purposes a group of persons *associated together for a common purpose of engaging in a course of conduct.* The pattern of racketeering activity, is on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an *ongoing organization,* formal or informal, and by evidence that the various associates *function as a continuing unit.* The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise.

(emphasis supplied, citation omitted). Moreover, in *United States v. Bagaric,* 706 F.2d 42 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983), the Second Circuit reviewed its decisions regarding what constitutes an "association" enterprise and concluded that:

> These decisions reflect the common sense recognition that a group of individuals may join together, and therefore be "associated in fact," § 1961(4), although not a legally cognizable entity in one of the traditional forms, *id.,* solely for the purpose of conducting their activities.

*Id.* at 56.

Plaintiffs allege that the enterprise "consists of a group of attorneys (who represented purchasers of residential real estate), abstractors, and other individuals and corporations, all associated in fact and engaged in the real estate settlement industry in Orange and Rockland Counties, New York." Elser Complaint, ¶ 105; *see also* Moll Complaint, ¶ 81. Plaintiffs claim that the "members of this enterprise include, but are not limited to, attorneys James M. Feeney and Ronald M. Kahn, and abstractors Timothy Miller and Heritage ..." *Id.* Plaintiffs also specify as part of the enterprise, in their memorandum of law (P. Elser Memo. at 16), certain Rockland County attorneys who have an "examining counsel" relationship with US Life: Messrs.

Berg, Mitchell, Kahn, Sellick, Ellner, Ellner, Leopold, Dillon and Reeder.

Defendant contends that plaintiffs fail to identify the disparate attorneys, individuals and corporations which allegedly comprise the enterprise, plaintiffs' attempt to amend their complaint via their brief notwithstanding. Furthermore, defendant argues that plaintiffs fail to state how these various individuals and entities functioned as a continuing unit or that they shared a common purpose to engage in a particular fraudulent course of conduct.

Plaintiffs' complaints do charge generally that the members of the alleged enterprise shared common purposes, namely, providing real estate settlement services to purchasers of residential real estate and maximizing illegal kickbacks. However, defendant is correct that plaintiffs fail to specify how these members joined together as a group to achieve these purposes. Instead, plaintiff conclusorily alleges that the members of the alleged enterprise were "associated in fact" by virtue of their involvement in the real estate settlement industry in Rockland and Orange Counties in New York and in light of their various dealings with US Life. Conspicuously absent from the complaints are any factual allegations regarding the continuity of structure or personnel of this group. *See, e.g., Laterza v. American Broadcasting Co.,* 581 F.Supp. 408, 414 (S.D.N.Y.1984); *see also Moss, supra,* 719 F.2d at 22. Moreover, in light of plaintiffs' belated attempt to add "examining counsel" to the alleged enterprise and therefore the manifest impossibility of pleading in their complaints the factual relationship between the examining attorneys and the other members of the enterprise, it is obvious to the Court that plaintiffs' papers fail to properly plead a RICO enterprise. Therefore, the Court hereby orders plaintiffs to amend their complaint to satisfy the standards for pleading a RICO enterprise in this Circuit. In so doing, plaintiffs must at least plead facts demonstrating that the originally alleged members of the enterprise, as well as the individual "examining" attorneys, were associated in some fashion.

*The Predicate Acts*

Plaintiffs' RICO claims are grounded upon the allegation that, at various times, US Life, for the purpose of carrying out the aforementioned fraudulent scheme, unlawfully, willfully and knowingly transmitted, or caused to be transmitted, by means of interstate telephone facilities, writings, signs, sounds, messages and signals to members of the enterprise and/or to plaintiffs and to members of the putative class in violation of 18 U.S.C. §§ 1343 and 1342. *See, e.g.,* Elser Complaint, ¶ 104(b). Defendant argues that plaintiffs' RICO claims should also be dismissed because they "fail to assert one specific instance where *defendant* ever transmitted any messages to members of the alleged enterprise by means of interstate telephone or wire facilities or through the U.S. mails." D. Elser Memo. at 28 (citing Elser Complaint, ¶ 104(a) (emphasis in original)).

In *Equitable Life Assurance Society v. Alexander Grant & Co.,* 627 F.Supp. 1023 (S.D.N.Y.1985), the Court emphasized that in order to state a claim of mail fraud under RICO, the complaint must specify:

"(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) the same, (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants 'obtained as a consequence of the fraud.' (citation omitted)."

*Id.* at 1029 (quoting *Conan Properties, Inc. v. Mattel, Inc.,* 619 F.Supp. 1167 (S.D.N.Y.1985) (Duffy, J.) (citation omitted). And, as this Court held in *Utz v. Correa,* 631 F.Supp. 592 (S.D.N.Y.1986), allegations under RICO must state that the defendant "manifested participation in the affairs of the enterprise...." *Id.* at 595.

Plaintiffs argue that the complaints state that not only did "defendant commit acts of

mail and wire fraud but that it aided, abetted, counseled, commanded, induced and procured others to violate the mail and wire fraud statutes." P. Elser Memo. at 17 (citing Elser Complaint, ¶ 1040). Plaintiffs concede that defendants may not have actually mailed the materials specifically listed in the complaint. Nevertheless, plaintiffs argue that US Life is still liable as a principal for aiding and abetting the commission of these acts by others. "Furthermore, defendant mailed the title insurance policies to attorney Feeney who, it knew full well, would mail them to plaintiffs, the purchasers of the title insurance." *Id.* Moreover, plaintiffs assert that because plaintiffs Elser and the Harlows were residents of states other than New York, at the times of the transactions in question, that telephone conversations between Elser or the Harlows and Feeney were necessarily interstate. *Id.* (citing Elser Complaint ¶¶ 40, 51). Finally, however, plaintiffs apparently concede that their complaints do not state, with the requisite precision, the specific facts necessary to establish the predicate acts, when plaintiffs seek to excuse their failure by noting that the "predicate acts upon which plaintiffs' RICO claims are based are peculiarly within the defendant's knowledge" and promising that further discovery will reveal further grist for their allegations. *Id.*

▬ In light of the Court's order herein that plaintiffs amend their complaints regarding enterprise, the Court holds now that, rather than prematurely deciding the question of whether plaintiffs' claims are sufficient to allow the case to go forward, plaintiffs be given another opportunity to allege more specifically in their complaints the predicate acts committed by defendant which form the basis of their RICO claims. At this stage of the litigation, the Court cannot find beyond preadventure that plaintiffs can prove no set of facts in support of their RICO claims which would entitle them to relief. Nevertheless, plaintiffs when redrafting their complaint, should be guided by the law in this Circuit as recently applied by the District Court. *See, e.g., Equitable Life Assurance Socie-* *ty, supra,* 627 F.Supp. at 1028; *Utz, supra,* 631 F.Supp. at 592.

*Investment Pursuant to Section 1962(a)*

▬ Section 1962(a) makes it unlawful "for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to *use or invest* ... such income to acquire an interest in or operating an enterprise." 18 U.S.C. § 1962(a) (1984) (emphasis added). The provision is designed to prevent the use of illegally-acquired funds to obtain an interest in or operate an enterprise. *See Turkette, supra,* 452 U.S. at 585, 101 S.Ct. at 2529 ("The aim is to divest the association of the fruits of its ill-gotten gains.").

Plaintiffs allege that defendant:

received income, to wit, title insurance premiums, derived, directly or indirectly, from the pattern of racketeering activity ... in which defendant US Life participated as a principal ... and unlawfully, willfully and knowingly used and invested, directly and indirectly, part of that income to acquire an interest in the enterprise and operation of the enterprise.

Elser Complaint, ¶ 108.

Defendant argues that the payment of funds in connection with a variety of real estate transactions is not sufficient to constitute an investment under § 1962(a). In addition, defendant claims correctly that the complaints do not contain any factual allegations that defendant owned part of Feeney's law practice or for that matter, any other organization. Defendant also correctly points out that, although plaintiffs claim defendant paid kickbacks, there are no allegations that defendant received kickbacks. Therefore, defendant concludes that plaintiffs once again fail to plead sufficiently a necessary element of their RICO claims.

Plaintiffs respond that "a fair reading of the complaint" indicates that US Life's "ill gotten gains consist of all the income which ... US Life derived through the payment of kickbacks," more particularly, the increase in the number of premiums received

on the alleged referral business. P. Moll Memo. at 45. In their memoranda of law, plaintiffs also claim that defendant *used* this money to acquire an *interest* in the operation of the enterprise, more precisely, control of Heritage. *Id.* at 45–45. Furthermore, in their memorandum plaintiffs promise that they *will* show that US Life used this income "to pay for free space, postage, copying and other expenses of Heritage, and in return, received all of the business which Heritage generated, as an abstractor." *Id.* at 46. Finally, in their memorandum of law, plaintiffs allege that US Life acquired another interest in the alleged enterprise: "an assurance of a continuous flow of referral business from the individuals associated with the enterprise." *Id.*

As a threshold matter, the Court notes that because it has already held that plaintiffs have not adequately pleaded the enterprise element of their RICO claims, it would be illogical, if not impossible, for the Court to find now that plaintiffs have properly alleged that defendant has invested or used income with respect to this very same purported enterprise. It is also obvious to the Court that plaintiffs are again attempting, through their legal memoranda, to hastily amend their complaints. Nowhere in the complaints can the Court find allegations that US Life had any *control* over Heritage, or that US Life acquired an ownership or some other type of interest in the corporation. Moreover, there are no factual allegations in the complaints that US Life permitted Heritage and other alleged members of the enterprise to use its facilities. Therefore, again, plaintiffs are ordered to replead this element of RICO.

*Rule 9(b)*

Defendant also moves to dismiss plaintiffs' fraud claims for failing to plead fraud with the particularity required under Fed. R.Civ.P. 9(b). The Federal Rules of Civil Procedure require a "short plain statement [demonstrating] that [a] pleader is entitled to relief." Fed.R.Civ.P. 8. However, rule 9(b) mandates that fraud "be stated with

particularity," and consequently, demands more than a "short plain statement." Thus, it is "insufficient in pleading fraud to merely set forth generalized allegations." *Bartels, supra,* 631 F.Supp. at 450.

The requirements of Rule 9(b) serve three salutary functions: first it assures that a defendant will be properly apprised of the foundation on which his adversary's claim rests; second, it operates to protect defendant's reputation by way of stopping a plaintiff from damaging a defendant's good name with out providing specific facts to support the charge of fraud; and third, it acts as a barrier to strike suits brought for their *in terrorem* effect and concomitant settlement value. *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).

"Rule 9(b) will have failed in its purpose if conclusory generalizations ... permit a plaintiff to set off on a long and expensive discovery process in the hope of uncovering some sort of wrong-doing or of obtaining a substantial settlement." *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 116 (2d Cir.1982). To avoid such abuses Rule 9(b) requires that the complaint identify "1) precisely what statements were made, and 2) the time and place of each statement, and the person responsible for making [or], (in the case of omissions, not making), the same, 3) the content of such statements and the manner in which they misled the plaintiff, and 4) what the defendants 'obtained as a consequence of the fraud.'" *Fidenas AG v. Honeywell, Inc.,* 501 F.Supp. 1029, 1039 (S.D.N.Y.1980) (quoting *Todd v. Oppenheimer & Co.,* 78 F.R.D. 415, 420–21 (S.D.N.Y.1978)) (in turn quoting *Gross v. Diversified Mortgage Investors,* 431 F.Supp. 1080, 1088 (S.D.N.Y. 1977)). *See Segal v. Gordon,* 467 F.2d 602 (2d Cir.1972). *Accord Bartels, supra,* 631 F.Supp. at 450; *Conan Properties, supra,* 619 F.Supp. at 1167. Moreover, any allegation, such as those made by plaintiffs in this action, on information and belief, must be supported by a "statement of the source of the information and the reasons upon

which the belief is founded." *Goldberg v. Meridor,* 81 F.R.D. 105, 111 (S.D.N.Y.1979) (footnote omitted).

The language of this Court's opinion, *supra,* sufficiently informs plaintiffs of the myriad ways in which their complaints fall short of the standard set by Fed.R.Civ.P. 9(b). The Court declines to review the shortcomings previously discussed but instead refers plaintiffs to the earlier sections of this opinion where the Court directed plaintiffs to replead their complaints. The Court, however, will briefly discuss here the limitations in the various sources of knowledge underlying plaintiffs' complaint.

██ The preponderance of plaintiffs' allegations in their complaints are made upon information and belief. *See, e.g.,* Moll Complaint (except for paragraphs 19, 35–42, 44, 46–47, the entire complaint is made upon information and belief). Plaintiffs must adequately specify the sources of their information and belief under Rule 9(b). *See Segal, supra,* 467 F.2d at 608. As Judge Weinfeld has noted, to satisfy this requirement,

> the sources of the information and belief should be sufficiently identified so as to allow each defendant and the Court to review the sources and determine, at the pleading stage, whether an inference of fraud may be fairly drawn from the information contained therein.

*Crystal v. Foy,* [1981–82 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,204 at 91,429 (S.D.N.Y.1981).

Plaintiffs do generally identify materials, namely, congressional reports, U.S. Department of Housing and Urban Development pamphlets, and testimony in state court proceedings, which allegedly constitute the sources of their allegations of fraud. However, plaintiffs do not cite which allegations of fraud are based on which sources of information. Therefore, in repleading their complaint, plaintiffs are directed to set forth more explicitly the sources of their allegations which are made on information and belief.[7]

## CONCLUSION

For the foregoing reasons, the Court grants defendant's motion to dismiss. Plaintiffs are granted leave to replead their complaints, to the extent consistent with the language of the decision herein. If plaintiffs chose to do so, they must file their amended complaints, with the Court, on, or before, 60 days from the entry of this Order.

**SO ORDERED.**

---

7. The Court declines to reach defendant's substantive arguments in support of its motion to dismiss plaintiffs' state law claims because the Court has not yet found that there are *bona fide* federal causes of action upon which this Court can assert pendent jurisdiction over the state causes of action.